UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| GARFIELD FEATHER, | * | CIV 18-4090 |
| Petitioner, | * | |
| | * | MEMORANDUM OPINION |
| vs. | * | AND ORDER |
| UNITED STATES OF AMERICA, | * | |
| Respondent. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Petitioner Garfield Feather ("Feather") moved to vacate or set aside his conviction pursuant to 28 U.S.C. § 2255. (Doc. 1.)  For the following reasons the motion is denied.

**BACKGROUND**

Following a three-week jury trial in 1994, Feather and three co-defendants were convicted on several counts of aggravated sexual abuse in violation of 18 U.S.C. § 2241(c). All defendants are Native American men.  Another Native American man was acquitted.

After trial, the Clerk's Office received a call from a co-worker of juror Patricia Pickard. The co-worker, Verna Boyd (then Severson), said that Patricia Pickard was prejudiced against Native Americans.  This Court notified counsel for Petitioners and held four separate hearings on the alleged juror misconduct. *See* CR 94-40015, Doc. 323.  Pursuant to Federal Rule of Evidence 606(b), the Court instructed the attorneys not to contact any of the jurors, and the jurors were not allowed to testify about any statement made or incident that occurred during deliberations. In addition to hearing the testimony of Boyd and Pickard, the Court heard testimony from the jury foreperson, the alternate juror, and multiple co-workers of Pickard. The Court ultimately concluded that juror Pickard had "responded honestly and accurately" during voir dire and had not concealed "any racially prejudiced attitudes, beliefs, or opinions" about Native Americans. Doc. 323 at 11. The Court found that "as between juror Pickard and Ms. [Boyd], juror Pickard [was] the

1

more credible witness." *Id.* The Court further found that the jury foreman and an alternate juror testified credibly "that they did not hear juror Pickard or any other juror make racially disparaging remarks about the defendants or about Native American people during the trial," *id.* at 14, and "that no improper outside influence affected the jury." *Id.* at 5. Petitioners' motion for a new trial was denied. *Id.*

On direct appeal, a divided panel of the Eighth Circuit initially reversed and remanded for a new trial, holding that this Court erred in rejecting expert testimony that the children's testimony regarding sexual abuse had been coerced by the adults in the case. *See United States v. Rouse*, 100 F.3d 560, 566 (8th Cir. 1996). However, the Eighth Circuit panel granted rehearing and affirmed the exclusion of the proposed expert testimony, and it affirmed this Court's denial of the motion for new trial which was based upon co-worker Boyd's testimony. *United States v. Rouse*, 111 F.3d 561, 573 (8th Cir. 1997) (holding in part that this Court's findings on the motion for new trial established that no new trial was warranted because of juror Pickard's responses during voir dire).

The facts underlying Feather's conviction are described in the Eighth Circuit's opinion affirming the convictions of all four defendants after rehearing. The defendants, who include two brothers and their two cousins, were convicted of sexually abusing young female relatives on the Yankton Sioux Indian Reservation:

> The victims are granddaughters of Rosemary Rouse. During the summer and fall of 1993, defendants lived at Rosemary's home on the Yankton Sioux Reservation. The victims also lived or spent a great deal of time at this home. In October 1993, five-year-old R.R. was placed with Donna Jordan, an experienced foster parent, due to neglect and malnutrition. R.R. disclosed apparent sexual abuse to Jordan, who reported to the Tribe's Department of Social Services ("DSS") (as Jordan was required to do) that R.R. said she had been sexually abused. On January 10, 1994, DSS told Jordan to take R.R. to therapist Ellen Kelson. After an initial interview, Kelson reported to DSS (as Kelson was required to do) that R.R. had reported acts of sexual abuse against herself and other children in the Rouse home. On January 11, DSS removed thirteen children living in the Rouse home and placed them in Jordan's foster home. Of the four who disclosed sexual abuse by their uncles, T.R. was seven years old, L.R. was six, R.R. was five, and J.R. was four and one-half. The fifth victim of the alleged offenses, F.R., was a twenty-month-old infant.

*Rouse*, 111 F.3d at 565.

The children were examined by two physicians, Richard Kaplan and Robert Ferrell.  Dr. Ferrell is an obstetrician and gynecologist. He testified that he found physical injuries consistent with sexual abuse. The evidence at trial included the testimony of the four oldest children and

another child who witnessed acts of abuse, medical evidence, medical experts for the government and for the defense, and the testimony of an FBI agent and a BIA criminal investigator, both who interviewed the children. *Id.* at 566. The defendants also presented numerous lay witnesses in support of their defense at trial.

In 1999, the defendants filed a second motion for a new trial pursuant to Rule 33(b)(1) of the Federal Rules of Criminal Procedure based on recantations of the victims.[1] *See* CR 94-40015, Doc. 428. This Court held a four-day evidentiary hearing in 2001. *See United States v. Rouse*, 329 F.Supp.2d 1077 (D.S.D. 2004). Jessica, Thrista, Lucritia and Rosemary Rouse testified that the abuse did not occur. Experts and several other witnesses testified. This Court concluded that the recantations were not credible. *Id*. The Eighth Circuit affirmed that finding:

> After reviewing the record as a whole, we conclude that the district court's credibility findings are not clearly erroneous and the denial of the new trial motion was not a clear abuse of discretion. By the time of the evidentiary hearing, the children had been living with their mothers for at least two years, within walking distance of their grandmother's home. These women never believed the children's accusations, and testified on the defendants' behalf at trial. The children knew their grandmother and mothers missed the defendants. The children saw letters written by the uncles from prison and spoke to the men by telephone. Family members drove the children to interviews by Dr. Underwager, whose stated purpose was to free their uncles from lengthy prison sentences. The district court's finding that the recantations were the product of family pressure and therefore not credible is overwhelmingly supported by this record. Combined with the defendants' failure to refute the powerful medical evidence of abuse at trial, this finding fully justified the court's conclusion "that there is no reasonable probability that the recantations would produce an acquittal if a new trial were held." Accordingly, the district court did not abuse its discretion in denying the defendants' joint motion for a new trial.

*United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005).

On August 20, 2010, Feather filed his first § 2255 motion to vacate. *See* Civ. 10-4115. On November 12, 2010, the motion was erroneously dismissed as successive, relying on a previous order of the Eighth Circuit denying Feather leave to file a successive § 2255.

On March 5, 2018, now represented by counsel, Feather once again erroneously sought leave to file a successive § 2255 motion from the Eighth Circuit. *See* 18-014180. The Eighth

---

[1] Fury Rouse was only 20 months old at the time of the abuse and did not testify at trial and thus did not recant.

Circuit denied leave to file a successive petition on June 4, 2018. Feather filed this pending § 2255 motion on July 27, 2018. (Doc. 1.)

On August 1, 2018, Feather filed a Motion for Reconsideration pursuant to Rule 60(a) of the Federal Rules of Civil Procedure, in his 2010 habeas action. *See* Civ. 10-4114, Doc. 6. Feather asked this Court to reconsider its ruling dismissing as successive his 2010 motion under 28 U.S.C. § 2255, and to permit him to withdraw his 2010 motion that was incorrectly dismissed as a successive petition. The government did not oppose the motion and it was granted. The government has responded to Feather's present § 2255 motion, and it is fully briefed and ready for ruling.

On March 7, 2018, Feather's co-defendants filed motions for new trial. The Court held argument on the motions on October 31, 2018 and denied the motions for a new trial on March 18, 2020. *See* Civ. 06-4008, Doc. 56 (Desmond Rouse and Jesse Rouse); Civ. 98-4176 (Russell Hubbling). His co-defendants filed their motions for a new trial under Federal Rule of Civil Procedure 60(b)(6), and the Court found they were second or successive § 2255s. Feather makes some of the same substantive claims as his co-defendants, but his case differs procedurally because this is considered to be his first § 2255 motion.

## LEGAL STANDARD

Section 2255 allows a federal prisoner to move to "vacate, set aside or correct" a federal sentence upon the ground that "the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255. Thus, relief is available under section 2255 "on the ground that '[a person] is in custody in violation of the Constitution or laws or treaties of the United States.'" *Davis v. United States*, 417 U.S. 333, 344 (U.S. 1974); *Watson v. United States*, 493 F.3d 960, 963 (8th Cir. 2007).

"Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice. *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996) (citing *Poor Thunder v. United States,* 810 F.2d 817, 821 (8th Cir. 1987)). A petitioner

bears the burden of showing that he is entitled to relief. *Day v. United States*, 428 F.2d 1193, 1195 (8th Cir. 1970).

## CLAIMS PRESENTED

Feather's § 2255 motion lists two grounds for relief. First, he claims that there is "significant new proof of innocence that has not been reviewed by the Court previously, including medical experts who specialize in pediatric sexual assault cases, psychology experts and scholars who specialize in interviewing techniques of children in suspected abuse cases, and credible and genuine recantations by the now-adult complainants, and overall evidence that a miscarriage of justice has occurred." (Doc. 1.)

Second, he asserts that there are "significant issues of racism that may have taken place in the jury room that the Court should review further without the restriction of Federal Rule of Evidence 606(b) preventing inquiry into that issue pursuant to *Peña-Rodriguez v. Colorado*." (*Id*.)

In his Reply Brief in support of his § 2255 motion, Feather adds a new constitutional claim. He asserts that his conviction violates his rights under the Fifth Amendment Due Process Clause because the conviction was based on flawed scientific testimony that undermined the fundamental fairness of the trial.[2] (Doc. 22.)

### I.    TIMELINESS

The government argues that, with regard to the new expert medical evidence, Feather failed to meet the one-year statute of limitations applicable to petitions predicated on newly discovered evidence.[3]

For a motion filed under 28 U.S.C. § 2255 to be timely, it must be filed within one year of the "latest" of one of the four triggering dates described in subsection (f) of section 2255. Subsection (f) states:

---

[2] The government did not have the opportunity to address this claim because it was raised for the first time in Feather's Reply Brief.

[3]  The timeliness of Feather's claim based on *Peña-Rodriguez* will be addressed later in the discussion of that claim.

A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of--

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C.A. § 2255.

Under subsection (f)(4), the one-year period runs from the date Feather could have discovered the new expert evidence "through the exercise of due diligence." The Supreme Court has stated that "diligence can be shown by prompt action on the part of the petitioner as soon as he is in a position to realize" that he should act. *Johnson v. United States*, 544 U.S. 295, 308 (2005). The Eighth Circuit has explained that courts should consider "when a duly diligent person in petitioner's circumstances would have discovered" the operative facts. *Anjulo-Lopez v. United States*, 541 F.3d 814, 817–18 (8th Cir. 2008) (internal quotation and citation omitted).

The government contends that the experts' opinions based on the absence of photographic documentation of the physical exams is not new evidence because it is a fact known since the exams were conducted. In addition, the government argues Feather's § 2255 is untimely with regard to all of Dr. Adams' opinions because she first provided the same opinions in an affidavit dated August 8, 2014. Feather points out that the affidavits of Dr. Adams and Dr. Ophoven that he submitted in this case were executed on February 27, 2018 and February 26, 2018 respectively, only a few months before Feather filed his § 2255 motion on July 27, 2018, well within the one-year limit. Feather asks the Court to consider a variety of factors:

An essential aspect of Mr. Feather's circumstances was that he was an incarcerated person representing himself pro se until attorney Dan Fritz took on his representation pro bono in January 2018, just a few months before filing Mr. Feather's § 2255 motion. Prior to obtaining legal representation, Mr. Feather plainly was not in a position to sort through highly technical medical literature in order to assess the degree to which scientific developments have discredited the testimony used to convict him. He needed experts to do that, and he needed counsel to assist him in marshalling that expert testimony.

6

This case, because it involves newly discovered evidence that is scientific and specialized in nature, is very different from other cases where courts found that petitioners failed to exercise reasonable diligence to discover the types of facts that are discrete and readily knowable, even for unsophisticated laypersons.

Doc. 22 at p. 4.

The Court concludes that Feather has been pursuing his rights diligently and, under all of the circumstances in this case, the fact that Dr. Adams executed an affidavit in 2014 does not render Feather's § 2255 untimely. There is no indication that Feather was aware of that affidavit. Furthermore, there is no showing that Dr. Ophoven's opinions could have been discovered prior to 2018. In addition, though it's true that the absence of photographs has been known since the trial, there were no experts opining on the effect of the lack of photographic documentation of physical abuse until recently. Because Feather's claim based on newly discovered expert testimony is timely, the Court does not need to address Feather's argument that his showing of actual innocence creates a gateway providing passage past a procedural bar to his claim.

## II.    MERITS

Turning to the merits of his claims, Feather argues that new evidence shows he is actually innocent. In his reply brief, Feather for the first time argues that his conviction violates the Fifth Amendment Due Process Clause because it was based on flawed scientific testimony that undermined the fundamental fairness of the proceedings. Finally, Feather contends that the Supreme Court's decision in *Peña-Rodriguez v. Colorado*, – U.S. – , 137 S. Ct. 855 (2017), opens the door for this Court to revisit whether racism played a part in his conviction.

### A.   Actual Innocence

Feather argues that the new medical evidence combined with the victim recantations by the now-adult complainants show he is actually innocent. Citing *Schlup v. Delo*, 513 U.S. 298 (1995), Feather asserts that '[n]o reasonable unbiased juror hearing this evidence at the time of trial would have convicted" him, and that a fundamental miscarriage of justice occurred, entitling him to relief from the "wrongful conviction." (Doc. 2 at p. 18.)

The United States Supreme Court has "not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (citing *Herrera v. Collins*, 506 U.S. 390, 404–05 (1993)); *District Attorney's*

*Office v. Osborne*, 557 U.S. 52, 71 (2009) (stating that whether a constitutional right to be released upon proof of "actual innocence" exists is an open question with which the Court has "struggled" over the years); *Dansby v. Hobbs*, 766 F.3d 809, 816 (8th Cir. 2014). The Supreme Court has assumed without deciding that persuasive proof of actual innocence in a capital case "made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417.

The Eighth Circuit has described the standard that would apply to a freestanding claim of actual innocence, if one is cognizable:

> The Supreme Court has not decided whether a persuasive demonstration of actual innocence after trial would render unconstitutional a conviction and sentence that is otherwise free of constitutional error. *See House v. Bell*, 547 U.S. 518, 554-55 (2006). The Court has established, however, that the threshold for any such claim, if it were recognized, would be "extraordinarily high." *Herrera v. Collins*, 506 U.S. 390, 417 (1993). The threshold, if it exists, would require "more convincing proof" than the "gateway" standard that allows for consideration of otherwise defaulted constitutional claims upon a showing of actual innocence. *House*, 547 U.S. at 555*; see Schlup v. Delo*, 513 U.S. 298, 315 (1995). Thus, on a freestanding claim of actual innocence, it is not sufficient that a petitioner shows even that it is "more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. The "extraordinarily high" threshold, if recognized, would be even higher. *House*, 547 U.S. at 555.

*Dansby*, 766 F.3d at 816.

In *House v. Bell,* the Supreme Court elaborated on how a habeas court is to weigh evidence presented in support of a *Schlup* gateway actual innocence claim:

> *Schlup* makes plain that the habeas court must consider " 'all the evidence,' " old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under "rules of admissibility that would govern at trial." *See id.,* at 327–328, (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments,* 38 U. Chi. L.Rev. 142, 160 (1970)). Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do." 513 U.S., at 329, 115 S.Ct. 851. The court's function is not to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors. *Ibid.*
>
>    * * *
>
> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt-or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

\* \* \*

> Because a *Schlup* claim involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. *See ibid.* If new evidence so requires, this may include consideration of "the credibility of the witnesses presented at trial." *Ibid.; see also ibid.* (noting that "[i]n such a case, the habeas court may have to make some credibility assessments").

*House,* 547 U.S. at 538–39. To assert a freestanding actual innocence claim, a petitioner must submit "more convincing proof" than the *Schlup* standard.  In other words, a petitioner in Feather's position must go beyond demonstrating it is "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt." *House,*  547 U.S. at 538. As discussed below, Feather's evidence does not meet this requirement.

### 1.  Recantations

Feather submitted affidavits of the victims indicating that they again are recanting their allegations of sexual abuse. According to Feather, "every single alleged victim is now an adult woman, no longer living with their mothers and grandmothers, and they continue to say that they were never sexually assault.  It is an insult to the victims for these sham convictions to continue to be upheld.  Their voices must be heard." (Doc. 2 at p. 29.)

After a four-day hearing in 2001, this Court found that the victims' earlier recantations would not have affected the outcome of the trial.  *See United States v. Rouse*, 329 F.Supp.2d 1077, 1087–92 (D.S.D. 2004).[4]  As this Court noted, recanted testimony is notoriously unreliable, and even more so when the testimony recanted implicates the witnesses' relatives. *See* 329 F.Supp.2d at 1087–88. The Eighth Circuit has repeatedly said that recantations are viewed with suspicion. *United States v. Rouse*, 410 F.3d 1005, 1009 (8th Cir. 2005) ("We view with suspicion motions for new trial based on the recantation of a material witness because the stability and finality of verdicts would be greatly disturbed if courts were too ready to entertain testimony from witnesses who have changed their minds, or who claim to have lied at the trial.") (internal quotation and citation omitted).

Even if the trial testimony of Dr. Ferrell regarding his physical findings of sexual abuse is ignored, enough other corroborating evidence of the abuse was presented at trial to leave the Court

---

[4] The Court incorporates its findings and conclusions from its earlier decision herein.

confident in the outcome even considering the new recantations. The victims' testimony at trial corroborated portions of other witnesses' testimony about the sexual abuse, including the foster mother who received the initial report of abuse from one of the victims and the federal investigators who were told by the victims that their uncles hurt them. Also, the trial testimony of Dr. Ferrell and Dr. Kaplan regarding spontaneous statements the children made to them was corroborative of the victims' testimony at trial.

The evidence and testimony presented at the 2001 evidentiary hearing on recantations further support a finding that the recent recantations are not as credible as the victims' trial testimony. The Court will not repeat all the evidence here, but an example is testimony from the children's counselors that the kids "continued to describe the acts of sexual abuse to them after the trial and before the children were returned home." 329 F.Supp.2d at 1081.

After considering the evidence presented at trial, the evidence presented during the 2001 evidentiary hearing, and the recent affidavits of the recanting victims, the Court cannot conclude that no reasonable juror would vote to convict Feather because of the new recantations by the victims now that they are adults. A reasonable juror could conclude that the trial testimony was credible, and a reasonable juror could reject the earlier and the more recent recantations. In other words, a reasonable juror, considering all the evidence, old and new, still could convict Feather of sexual abuse. Thus, Feather fails to meet the burden required to pass through the *Schlup* actual innocence gateway (that it is more likely than not that no reasonable juror would have found Feather guilty beyond a reasonable doubt), and it necessarily follows that the recantations do not amount to the "more convincing proof" required for a freestanding actual innocence claim, if such a claim is cognizable.

## 2. Medical Experts

Feather submitted affidavits from new medical experts averring that significant changes in the field of sexual abuse in children show that the forensic medical evidence of sexual abuse that was presented at trial by Dr. Ferrell was inaccurate. Feather's experts criticize the physical examinations for sexual abuse conducted by Dr. Ferrell and disagree with his findings and opinion that sexual abuse occurred.

The Court indicated in an earlier Order that the only medical expert evidence it considers newly discovered evidence is the positions of Dr. Adams and Dr. Ophoven. *See* Civ. 06-4008, Doc. 43.  As a preliminary matter the Court determined that the proposed testimony of Dr. Adams and Dr. Ophoven is credible.

Dr. Ophoven stated in her affidavit, in part:

…it is my opinion that Dr. Ferrell's findings and testimony do not identify evidence that describes or confirms the presence of sexually related injury. Specifically, my review of the findings and testimony does not identify any evidence to support an accusation of sexual abuse. The testimony by Dr. Farrell describes variations in normal prepubertal female anogenital anatomy.

(Doc. 3-4, Affidavit of Dr. Janice Ophoven, ¶ 19.)

Dr. Joyce Adams expressed in her affidavit:

Medical testimony is given great weight by jurors, as has been determined by multiple studies and reports. If the medical evidence of Doctor Ferrell, was given any weight by the jury in its deliberations, these cases must be re-assessed. As an expert in child abuse and Pediatrics, I do not find anything in Doctor Ferrell's reports that convinced me that there was any trauma in any of the children.

(Doc. 3-3, Affidavit of Joyce A. Adamas, M.D., ¶ 7.)

In his opening brief, Feather sums up Dr. Adams and Dr. Ophoven's testimony:

Dr. Joyce Adams, an expert in the area of pediatric assessment of sexual assault in children who has published extensive peer reviewed studies in the area regularly used by other practitioners in the field, confirms that the abnormal findings described by Dr. Ferrell are not signs of trauma at all, but normal internal structures for genitalia. (Exhibit C #6a, 9). Dr. Janis Ophoven, another expert with over thirty years of experience in the field specializing in injuries to children, confirms that the criteria relied on by Dr. Ferrell were subjective and unreliable and led to unreliable findings of sexual assault based on hymen and anal dilatation, hymenal notches, nonspecific marks and areas of erythema [reddening], pigmentation, and vaginal ridging, when in fact these are all normal variations found in the examination of the anogenital anatomy in children. (Exhibit D #14, 19).

Further, all affirm that Dr. Ferrell in particular, the only person to who testified to physical signs of sexual abuse, was in no way qualified to do the examination. He had no specialty in pediatrics, let alone pediatric sexual assault. (Exhibit C #6, 10, Exhibit D #14). Further, although correct procedure would have been to document his findings with photographs so an expert could review his findings, he did not. (Exhibit C #8, Exhibit D #19). His testimony is flawed and archaic based on today's scientific knowledge of the field. (Exhibit B [Certification# 13]).

(Doc. 2, p. 13.)

The proposed testimony of Dr. Adams and Dr. Ophoven regarding advancements in the science concerning detection of child sexual abuse do not prove Feather's innocence, even if the criteria relied on by Dr. Ferrell was subjective and unreliable and led to unreliable physical findings of sexual assault as claimed by the new experts.  Though she would have expected clinical signs of sexual abuse based on the witness statements and the age of the victims in this case, Dr. Ophoven stated that "many cases of sexual misuse will not show signs of injury especially if  the misuse does not involve typical vaginal intercourse."  (Doc. 3-4, Affidavit of Dr. Janice Ophoven, ¶ 18.) The Court does not know what Dr. Ferrell's testimony would be in a retrial.  But Dr. Kaplan is deceased and his trial testimony would be admissible into evidence.  *See* Fed. R. Evid. 804(b)(1)(A) and (B) (explaining exception to the rule against hearsay for former testimony given as a witness at a trial when the party against who it is now offered had "an opportunity and similar motive to develop it by direct, cross-, or redirect examination").

Dr. Kaplan was a pediatric medical doctor with an emphasis on child sexual abuse.  Dr. Kaplan co-authored an article with Dr. Joyce Adams, one of Feather's new medical experts, entitled *Guidelines for Medical Care of Children Who May Have Been Sexually Abused*. (Doc. 3, Affidavit of Daniel Fritz, Ex. C, Affidavit of Joyce A. Adams, M.D. at p. 21.)  A summary of Dr. Kaplan's trial testimony was presented by the government in its brief:

> During Jessica Rouse's medical exam by Dr. Kaplan, she stated "Uncle Jesse hurt me" and when asked where, pointed to her left labia. *Rouse*, 329 F. Supp. 2d at 1090. When Jessica Rouse's anal opening was examined, she stated that Uncle Jess has used his hand in her butt. *Id.* She was four and a half years old at the time. *Id.* Similarly, when Dr. Kaplan examined Lucritia Rouse, she told him to "check my peach" because it hurt. *Id.* During Dr. Kaplan's examination of then five year old Rosemary Rouse, she volunteered spontaneously that "I have a bruise where my uncle put his private spot" and volunteered that her uncle Garfield did this at her Grandma's house. *Id.* Rosemary also volunteered that her uncle put his private "in my butt." *Id.* When Dr. Kaplan examined Thrista Rouse, who was seven years old, she told Dr. Kaplan that "Uncle Jesse hurt me there" in reference to her inner labia majora. *Id.* These reports were made before the victims were interviewed by the FBI and before they began counseling sessions. *Id.* at 1091.

(Doc. 21 at p. 17-18.) The victims' reports to Dr. Kaplan are support for the charge that Feather sexually abused them.

The new expert opinions criticizing Dr. Ferrell's opinion that his physical findings indicated the victims were sexually abused is not evidence that exonerates Feather. Dr. Ferrell's testimony was compelling, but the government's case did not depend solely on Dr. Ferrell's opinions. And even though more modern sexual abuse science led Feather's experts to a different conclusion, there was ample other evidence of Feather's guilt presented at trial. That sexual abuse occurred was independently corroborated by fact witness testimony. Had the jury heard the conflicting testimony of Dr. Ophoven and Dr. Adams, or had the jury not heard the testimony about Dr. Ferrell's physical findings, a reasonable juror viewing the record as a whole could still find Feather guilty. It cannot be said that Feather's newly proposed experts' opinions would more likely than not result in his acquittal.

Feather has failed to show that he meets the *Schlup* gateway standard because this Court cannot conclude that no reasonable juror would vote to convict Feather. Had the jury heard all the conflicting testimony, a reasonable juror viewing the record as a whole could still convict Feather. *Schlup,* 513 U.S. at 327. It follows that Feather also fails to meet the heightened standard of proving actual innocence on a freestanding innocence claim. Thus, no relief is available on the innocence claim.

### 3. Combination of Recantations and Medical Experts

To the extent Feather contends that a combination of the new medical expert testimony and the victim recantations shows he is actually innocent, that claim also fails. The Court concludes that if Feather's new medical and recantation evidence would have been presented at trial it would have established, at most, conflicting testimony. The jury would have been required to weigh the witnesses' credibility just as it did with the witnesses who testified at the trial, to determine whether reasonable doubt existed as to Feather's guilt. The Court does not conclude that no reasonable juror could have found Feather guilty even with the combination of new recantation and medical evidence. In other words, a reasonable juror considering all the evidence, old and new, could still convict Feather.

### B.  Violation of Fifth Amendment Due Process Clause

In his reply brief, Feather raises for the first time a claim that his conviction violates his rights under the Fifth Amendment Due Process Clause because the conviction was based on flawed

scientific testimony that undermined the fundamental fairness of the proceedings. Specifically, he contends that the testimony of Dr. Kaplan and Dr. Ferrell was based on methods and ideas of diagnosing childhood sexual assault that have been discredited by subsequent scientific developments in the field. Feather relies on the Third Circuit's decision in *Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012), and the Ninth Circuit decision in *Gimenez v. Ochoa*, 821 F.3d 1136 (9th Cir. 2016), both of which recognized such a claim and distinguished it from a freestanding claim of actual innocence.

Lee was convicted of first degree murder and arson in Pennsylvania state court in 1990. In 2012, the Third Circuit held that Lee was entitled to discovery to pursue his claim that the admission of the Commonwealth's fire expert testimony undermined the fundamental fairness of Lee's entire trial because critical testimony was premised on since-debunked forensic evidence. *Id.* 407. The Third Circuit observed that

> Lee also argues that he is entitled to federal habeas relief because he is actually innocent. As explained hereafter, Lee's allegations, if proven, would be sufficient to establish a due process violation. Therefore, we need not decide whether Lee's allegations meet the "extraordinarily high" threshold for granting federal habeas relief based on a freestanding claim of actual innocence. *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 53, 122 L.Ed.2d 203 (1993).

*Lee*, 667 F.3d at 404 n. 5. In remanding for discovery and further evidentiary proceedings, the Third Circuit discussed the standard that Lee was required to meet to succeed on his due process claim:

> To succeed, Lee must show that the admission of the fire expert testimony undermined the fundamental fairness of the entire trial, *Keller v. Larkins*, 251 F.3d 408, 413 (3d Cir. 2001), because the probative value of [the fire expert] evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission. *Bisaccia v. Attorney Gen.*, 623 F.2d 307, 313 (3d Cir. 1980) (quoting *United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir. 1974)).

*Lee*, 667 F.3d at 403. The Court stated:

> If Lee's expert's independent analysis of the fire scene evidence — applying principles from new developments in fire science — shows that the fire expert testimony at Lee's trial was fundamentally unreliable, then Lee will be entitled to federal habeas relief on his due process claim.

*Lee*, 667 F.3d at 407–08.

On remand, the Magistrate Judge held an evidentiary hearing and issued a Report and Recommendation finding that "the admission of the fire expert testimony undermined the fundamental fairness of the entire trial" because the "verdict . . . rest[ed] almost entirely upon scientific pillars which have now eroded." *Lee v. Tennis,* 2014 WL 3894306, at \*15–16 (June 13, 2014).  It also found that the Commonwealth failed to show other "'ample evidence' of guilt upon which the jury could have relied." *Id.* at \*18 (quoting *Albrecht v. Horn,* 485 F.3d 103, 126 (3d Cir. 2007)).  The district court adopted the Report and Recommendation and granted habeas relief on Lee's due process claim.  *Lee v. Tennis,* 2014 WL 3900230, at \*7 (M.D. Pa. Aug. 8, 2014). The Third Circuit affirmed, concluding that Lee "was convicted of murdering his daughter based primarily on scientific evidence that, as the Commonwealth now concedes, is discredited by subsequent scientific developments" and that "the Commonwealth has not pointed to 'ample evidence' sufficient to prove guilt beyond reasonable doubt."  *Lee v. Houtzdale,* 798 F.3d 159, 161, 169 (3d Cir. 2015).

In *Gimenez v. Ochoa,* the Ninth Circuit "join[ed] the Third Circuit in recognizing that habeas petitioners can allege a constitutional violation from the introduction of flawed expert testimony at trial if they show that the introduction of this evidence 'undermined the fundamental fairness of the entire trial.'" 821 F.3d 1136, 1145 (9th Cir. 2016) (citing *Lee,* 798 F.3d at 162.). Like the Third Circuit in *Lee*, the Ninth Circuit in *Gimenez* also distinguished the due process claim from a freestanding claim of actual innocence. *Gimenez,* 821 F.3d at 1144 ("such a petition for relief is not a 'freestanding innocence claim,' but a due process claim") (citing *Lee v. Houtzdale,* 798 F.3d at 162).

*Gimenez* involved a petitioner convicted of murder based, in part, on the theory that the victim exhibited the triad of symptoms (subdural hematoma, brain swelling and retinal hemorrhage) once thought to definitively indicate a shaken baby (often referred to as "shaken baby syndrome," or "SBS"). 821 F.3d at 1143. The habeas petition in *Gimenez* was successive, and, therefore, subject to 28 U.S.C. § 2244(b). That led to the application of the clear and convincing evidence standard for a successive petition pursuant to 28 U.S.C. § 2244(b). *See id.* at 1145.  The Ninth Circuit denied relief:

> Gimenez can't prove by "clear and convincing evidence" that "no reasonable factfinder" would have found him guilty but for the introduction of purportedly flawed SBS testimony. 28 U.S.C. § 2244(b)(2)(B)(ii); *see Gage v. Chappell,* 793 F.3d 1159, 1168

(9th Cir. 2015). That inquiry requires courts to examine the alleged constitutional violation "in light of the evidence as a whole" at a petitioner's trial. 28 U.S.C. § 2244(b)(2)(B)(ii); *Jones v. Ryan,* 733 F.3d 825, 845 (9th Cir. 2013). A juror could still have concluded that Priscilla was shaken to death based on her numerous suspicious injuries, Gimenez's inconsistent statements about Priscilla's tom frenulum and his admitted violent behavior. Even assuming the prosecution's experts couldn't testify that the triad alone establishes SBS, the evidence Gimenez presents isn't enough to show by clear and convincing evidence that "no reasonable factfinder" would have found him guilty. *Jones,* 733 F.3d at 845; *Gage,* 793 F.3d at 1168.

*Gimenez*, 821 F.3d at 1145.

Feather recognizes that the Eighth Circuit has not addressed whether introduction of flawed expert testimony could amount to a constitutional violation. *See Rhodes v. Smith*, 950 F.3d 1032, 1036 n. 2 (8th Cir. 2020). In *Rhodes*, the Eighth Circuit was faced with deciding if a petitioner convicted of murder for a drowning death could file a successive habeas after uncovering new evidence that contradicted expert testimony presented at his trial.[5] The Court assumed without deciding that new scientific information demonstrating that a conviction was the product of "false testimony" could amount to a violation of due process. *Id*. ("Like the district court, we assume for purposes of the argument, but do not decide these claims are constitutional violations."). Because the habeas petition in *Rhodes* was successive, it was subject to the stringent "clear and convincing evidence" standard for filing a successive habeas under 28 U.S.C. § 2244(b), just like the petition in *Gimenez*. Applying that standard, the Eighth Circuit concluded that the murder conviction was independently supported by other evidence, and the new evidence was insufficient to show, by clear and convincing evidence, that no factfinder would have convicted petitioner of murder. *Rhodes*, 950 F.3d at 1037. Thus, the petitioner was not entitled to file a successive habeas petition based on the newly discovered evidence. The Eighth Circuit in *Rhodes* did not discuss the appropriate standard for a due process claim that is brought in an initial habeas petition as in the present case.

Feather asks this Court to recognize that introduction of flawed expert testimony could amount to a constitutional violation in the Eighth Circuit, and to allow him to proceed with a due process claim under the standard set forth by the Third and Ninth Circuits in *Lee* and *Gimenez* - - which would require him to show that the introduction of flawed scientific evidence rendered his

---

[5] The new evidence included changes in scientific understanding regarding the forensics of drowning and new water-temperature evidence.

trial fundamentally unfair and that ample other evidence of his guilt does not exist.  Feather argues that he has proven a violation of his right to due process because he has shown the government relied on defective scientific testimony in its case against him, that the flawed testimony undermined the fundamental fairness of the trial, and that without the medical testimony in question there would not be ample evidence on which a jury could find him guilty beyond a reasonable doubt.

Assuming that such a due process claim is cognizable in the Eighth Circuit, this Court concludes that Feather's claim fails.  He has not shown the testimony of Dr. Ferrell has been "debunked" like the fire evidence that was used to obtain a conviction in *Lee*.[6]  Nor is it "false" as the petitioner claimed of the testimony in *Rhodes*.  Rather, the evidence is more akin to that at issue in *Gimenez*.  In rejecting the petitioner's claim that the opinions of his new experts proved that the government's experts provided false testimony about the victim's cause of death at trial, the Ninth Circuit noted that,"[t]o the extent that this new testimony contradicts the prosecution's expert testimony, it's simply a difference in opinion—not false testimony."  *Gimenez*, 821 F.3d at 1142.  Though Dr. Adams and Dr. Ophoven disagree that the physical findings described by Dr. Ferrell indicate sexual abuse, they do not say that Dr. Ferrell's testimony was false.

Even if Dr. Ferrell's reliance on his colposcope findings is outdated, it did not undermine the fundamental fairness of the entire trial.  And even assuming Dr. Ferrell couldn't testify that his physical findings alone establish sexual abuse, there is ample other evidence on which a jury could find Feather guilty beyond a reasonable doubt. As stated above, the victims' testimony at trial corroborated portions of other witnesses' testimony about the sexual abuse. Also, Dr. Kaplan and Dr. Ferrell testified about spontaneous statements the children made to them, and those statements corroborated the victims' testimony at trial. The evidence and testimony presented at the 2001 evidentiary hearing on recantations further supports a finding that the victims' trial testimony was credible. An example was given above of the testimony from the children's counselors that the kids "continued to describe the acts of sexual abuse to them after the trial and before the children were returned home." 329 F.Supp.2d at 1081.

---

[6] As noted above, the government admitted that the evidence used to convict Lee was faulty.  That is not the case here.

For these reasons, Feather has not shown that flawed scientific evidence rendered his trial fundamentally unfair in violation of his right to due process of law.

### C.  Effect of Peña-Rodriguez v. Colorado, – U.S. – , 137 S. Ct. 855 (2017)

In *Peña-Rodriguez*, the Supreme Court created a narrow exception to the no-impeachment rule found in Federal Rule of Evidence 606(b).[7]  The Court held that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires . . . the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." 137 S.Ct. at 869.

Feather argues that the new affidavit of Verna Boyd (Doc. 3-13, attached to the Affidavit of Daniel Fritz), is compelling evidence that racial animus took place during jury deliberations in this case.  Feather asks the Court to vacate his conviction or hold a hearing to inquire into the issue of racism during deliberations without the restrictions Rule 606(b) places on inquiry into comments made in the jury room, which is allowed under certain circumstances after the Supreme Court's decision in *Peña-Rodriguez. See, e.g.*, *United States v. Robinson*, 872 F.3d 760, 764 (6th Cir. 2017), *cert. denied*, 139 S. Ct. 55 (Oct. 2018) (holding, on direct appeal from conviction, that "[a]lthough *Peña-Rodriguez* permitted, in very limited circumstances, inquiry into a jury's deliberations, this case does not fit into these limited circumstances").

Feather filed this § 2255 motion over 20 years after his judgment of conviction became final. Accordingly, the motion would typically be barred by the one-year statute of limitations

---

[7]  Rule 606(b) provides:

**(b) During an Inquiry Into the Validity of a Verdict or Indictment.**
  **(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.
  **(2) Exceptions.** A juror may testify about whether:
       **(A)** extraneous prejudicial information was improperly brought to the jury's attention;
       **(B)** an outside influence was improperly brought to bear on any juror; or
       **(C)** a mistake was made in entering the verdict on the verdict form.

Fed. R. Evid. 606(b). The rule preventing inquiry into comments made in the jury room is known as the "no-impeachment rule."

in § 2255(f)(1). The government asserts that Feather's racial animus claim is barred by the one-year statute of limitations, and the government argues that Feather cannot obtain the benefit of the limitations period stated in § 2255(f)(3) because *Peña-Rodriguez* does not apply retroactively to cases on collateral review.

Subsection 2255(f)(3) provides that the one-year statute of limitations for filing a § 2255 motion runs from

> the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;

28 U.S.C. § 2255(f)(3). Thus, to obtain the benefit of the limitations period stated in § 2255(f)(3), Feather must show: (1) that the Supreme Court recognized a new right; (2) that the right "has been . . . made retroactively applicable to cases on collateral review"; and (3) that he filed his motion within one year of the date on which he Supreme Court recognized the right.[8]

In his opening brief, Feather argues that *Peña-Rodriguez* qualifies for retroactive application as a watershed rule of criminal procedure. (Doc. 2 at p. 20-22.) But in his reply brief, Feather seems to concede that *Peña-Rodriguez* does not recognize a new right. He states that his claim for relief "in no way depends upon *Peña-Rodriguez* applying retroactively" because the Sixth Amendment to an impartial jury devoid of racial animus "long predates *Peña-Rodriguez* and indeed predates his conviction." (Doc. 22 at p. 15.) He also says:

> The decision in *Peña-Rodriguez* comes into play not because it is the source of the right Mr. Feather seeks to vindicate, but rather because, before this decision, evidentiary rules prevented Mr. Feather from vindicating that right. To be clear, it was *not* the case that Mr. Feather's [conviction] was constitutionally sound before *Peña-Rodriguez* and only becomes constitutionally defective upon applying *Peña-Rodriguez* retroactively. Instead, Mr. Feather's conviction was *always* constitutionally defective. It is only now, after *Peña-Rodriguez*, that he has the tools at his disposal to prove that defect.

(Doc. 22 at p. 15.) Feather cites to no authority for the proposition that this Court can apply *Peña-Rodriguez* to his conviction because it is a new "tool" to prove a violation of the Sixth Amendment

---

[8] The United States Supreme Court decided the case of *Peña-Rodriguez* on March 6, 2017. Feather filed this § 2255 motion on July 27, 2018, so he did not meet the one-year deadline under 28 U.S.C. § 2255(f)(3). Neither party addressed this issue, possibly because Feather erroneously sought leave to file a successive § 2255 from the Eighth Circuit on March 5, 2018, within one year after *Peña-Rodriguez* was decided.

right to an impartial jury.  He does not explain why this claim is exempt from the timing requirements set forth in 28 U.S.C. § 2255(f)(1).  As set forth above, a defendant generally must file a § 2255 motion  within one year of the date that his conviction became final.  *See* 28 U.S.C. § 2255(f)(1).  Feather's claim asking this Court to apply *Peña-Rodriguez* is clearly untimely unless it falls within the exception to the one-year limitations period for motions raising a newly recognized right made retroactively applicable by the Supreme Court. *See id.* § 255(f)(3).

Even if the Court assumes, without deciding, that *Peña-Rodriguez* recognized a new right, the Court adheres to its prior conclusion that *Peña-Rodriguez* does not apply retroactively to cases pending on collateral review.  *See* Civ. 06-4008, Doc. 56 at p. 11–12. The Supreme Court has not held that *Peña-Rodriguez* is retroactive.  In a dissenting opinion filed in *Tharpe v. Sellers*, —U.S.—, 138 S.Ct. 545, 551 (2018) (per curiam) (Thomas, J., dissenting), Justice Thomas noted that "no reasonable jurist could argue that *Peña-Rodriguez* applies retroactively on collateral review." At least one Circuit Court has held that *Peña-Rodriguez* is not retroactive. *See Tharpe v. Warden*, 898 F.3d 1342, 1346 (11th Cir. 2018). Invoking *Peña-Rodriguez*, Tharpe, a state prisoner, sought postconviction relief in federal district court, arguing that a juror's racial bias influenced the guilty verdict in his trial. *Tharpe*, 898 F.3d at 1344. The Eleventh Circuit denied relief to Tharpe, holding that *Peña-Rodriguez* did not apply retroactively. The Court found that *Peña-Rodriguez* did not create a new substantive rule; rather, it created a new procedural mechanism for challenging a jury verdict. *Id.* at 1345–46. The Eleventh Circuit held that this new procedural rule did not rise to the level of a watershed, *id.* at 1346, and it denied a certificate of appealability. *See id.* at 1347.

This Court agrees with the reasoning of the Eleventh Circuit in *Tharpe* and finds that *Peña-Rodriguez* is not retroactive. Generally, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane*, 489 U.S. 288, 310 (1989).  "A new rule applies retroactively in a collateral proceeding only if (1) the rule is substantive or (2) the rule is a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Whorton v. Bockting*, 549 U.S. 406, 416 (2007) (internal quotation marks and alteration omitted).  Feather does not argue that *Peña-Rodriguez* is substantive, and he has not shown it is a watershed rule of criminal procedure that implicates fundamental fairness, which is an "extremely narrow"

exception to non-retroactivity. *Schriro v. Summerlin*, 542 U.S. 348, 352 (2004). The "watershed" exception "is clearly meant to apply only to a small core of rules requiring observance of those procedures that . . . are implicit in the concept of ordered liberty." *Beard v. Banks*, 542 U.S. 406, 417 (2004) (quoting *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997)). The "new rule must itself constitute a previously unrecognized bedrock procedural element that is essential to the fairness of a proceeding." *Bockting*, 549 U.S. at 421.

The Supreme Court has never found a new procedural rule to be "watershed." The Court recently explained:

> Under *Teague v. Lane*, newly recognized rules of criminal procedure do not normally apply in collateral review. True, *Teague* left open the possibility of an exception for "watershed rules" "implicat[ing] the fundamental fairness [and accuracy] of the trial." But, as this language suggests, *Teague's* test is a demanding one, so much so that this Court has yet to announce a new rule of criminal procedure capable of meeting it. And the test is demanding by design, expressly calibrated to address the reliance interests States have in the finality of their criminal judgments.

*Ramos v. Louisiana*, —U.S.—, 140 S.Ct. 1390, 1407 (2020). *Cf. Beard*, 542 U.S. at 417, (noting that *Gideon v. Wainwright's* guarantee of right to counsel "*might* fall within this exception") (emphasis added).

The Court concludes that, if *Peña-Rodriguez* recognized a new right, the right cannot be applied retroactively to cases on collateral review because it is not a "watershed" rule of criminal procedure. And if *Peña-Rodriguez* did not recognize a new right, the essential condition of § 2255(f)(3) that a new right be recognized to trigger the one-year limitations period is not satisfied. Thus, the portion of Feather's motion to vacate based on his jury bias claim fails as untimely.

Even if *Peña-Rodriguez* recognized a new right and qualified for retroactive application as a watershed rule, the Court is convinced that racism did not influence the jury verdict in this case. Thus, Feather's claim of actual innocence does not allow him to present this otherwise time-barred claim. Feather raised the jury prejudice claim in the motion for new trial filed by all four defendants in 1999. In 2001, this Court held four separate hearings on the claim and subsequently issued an Order denying the motion for new trial based on juror bias. This Court was satisfied that racial bias did not affect the jury's decisions in this case. After careful review of the prior

proceedings and the 2018 affidavit of Verna Boyd,[9] the Court remains convinced that Feather received a fair trial and that racial bias did not affect the jury's deliberations or verdict.

## Adverse Inference

Feather filed a motion to compel the deposition of Dr. Robert Ferrell. (Doc. 5.) This Court denied the motion to compel the deposition and instead ordered the government to provide an affidavit from Dr. Ferrell. (Doc. 8.)  The government submitted a declaration from Assistant U.S. Attorney Delia Druley in which she described unsuccessful efforts to obtain an affidavit from Dr. Ferrell. (Doc. 12.)  No affidavit has been submitted.  Feather moved for the Court to draw an adverse inference in his favor and against the government that: 1) Dr. Ferrell has abandoned his testimony at the criminal trial that, in examining the victims in this case, he observed physical evidence of sexual assault, and 2) that if Dr. Ferrell testified today, he would not testify that his examinations of the victims demonstrated evidence of sexual assault.  (Doc. 13.)  The government objects to an adverse inference. (Doc. 18.)

The Court denies Feather's request for the adverse inference. There are numerous possible reasons that Dr. Ferrell has not agreed to provide an affidavit. It is too great a leap to conclude that, because Dr. Ferrell did not provide an affidavit indicating what his opinions are today, he must have abandoned his testimony at the trial over 25 years ago that he observed evidence of sexual assault during his examinations of the victims.

## Evidentiary Hearing

Feather requests an evidentiary hearing for the Court to hear from Feather's experts, the victims, and Dr. Ferrell in order to present his new evidence of innocence.  He also asks the Court to hear testimony from the jurors concerning statements made during deliberations now that *Peña-Rodriguez* allows the Court to make such inquiries.

"While '[a] petitioner is entitled to an evidentiary hearing on a section 2255 motion unless the motion and the files and the records of the case conclusively show that [he] is entitled to no relief,' no hearing is required 'where the claim is inadequate on its face or if the record

---

[9]  The Court's discussion of the recent affidavit of Verna Boyd in the Memorandum Opinion and Order denying the co-defendants motion for new trial is incorporated herein.  *See* CIV 06-4008, Doc. 56 at pp. 14-15.

affirmatively refutes the factual assertions upon which it is based.'" *New v. United States*, 652 F.3d 949, 954 (8th Cir. 2011) (quoting *Anjulo-Lopez v. United States*, 541 F.3d 814, 817 (8th Cir. 2008)). The Third Circuit ordered an evidentiary hearing in *Han Tak Lee v. Glunt*, 667 F.3d 397 (3d Cir. 2012), because the state habeas court had refused to allow the plaintiff discovery of the arson fire investigation evidence.  That information was necessary for the plaintiff's new expert to reach conclusions regarding the fire science opinions that were crucial prosecution trial testimony.  In the present case, the medical records and other related evidence has been available since before the 1994 trial. Here, the motion, files and records of the case and related cases, along with the applicable law, show that Feather is not entitled to relief under 28 U.S.C. § 2255. Accordingly, an evidentiary hearing will not be held.

An evidentiary hearing is not required on Feather's *Peña-Rodriguez* claim because, as explained above, that claim is time-barred and also lacks merit.  Feather also is not entitled to an evidentiary hearing on his claims involving the new expert testimony or the victim recantations. This Court conducted Petitioners' trial and all other proceedings in this case. It is well versed in the facts of the case and had a first-hand opportunity to observe the witnesses and evidence at trial and at the hearing in 2001. In addition to seeing each witness and hearing each witness's testimony, the Court was able to observe their body language and demeanor. At the trial, three of the young victims were unable to testify in open court and the Court, after questioning, determined that the three victims should be permitted to testify by closed circuit television after making the findings required pursuant to 18 U.S.C. § 3509(b)(1)(B)(i). *See Rouse*, 111 F.3d at 568. Specifically, this Court found that the three victims were unable to testify in open court in the presence of Petitioners "because of fear." *See id*. at 568–69.  *See also* CR 94-40015, Docs. 215 and 229, Transcripts of Victims' In-Chambers Testimony.  The Court's observations of the witnesses and evidence support the jury's guilty verdicts against Feather.

After carefully considering and assessing the impact of the recantations and new experts' opinions on the strength of the government's case against Feather, the Court concludes that an evidentiary hearing is not necessary.

## CONCLUSION

The Court concludes that *Peña-Rodriguez* does not require reopening Feather's jury race bias claim. The Court also determines that Feather has failed to demonstrate actual innocence

under *Schlup*. It necessarily follows that if Feather has not met this lower standard, he has not provided the "more convincing proof" which is required to meet the threshold for a freestanding actual innocence claim—even assuming such a claim is cognizable as an avenue for relief. Finally, Feather has not shown that flawed scientific testimony undermined the fundamental fairness of his trial in violation of due process, if such a claim exists in the Eighth Circuit. Accordingly, Feather's motion for relief under 28 U.S.C. § 2255 is denied.

## CERTIFICATE OF APPEALABILITY

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that reasonable jurists could find it debatable whether Feather has shown that he was denied a constitutional right. Accordingly, the Court grants a Certificate of Appealability on the three constitutional claims asserted by Feather.

**IT IS ORDERED**:

1. That Garfield Feather's motion to vacate or set aside conviction pursuant to 28 U.S.C. §2255, Doc. 1, is denied;

2. That a Certificate of Appealability is granted;

3. That the motion for an adverse inference, Doc. 13, is denied.

Dated this 14th day of September, 2020.

BY THE COURT:

Lawrence L. Piersol
United States District Judge

ATTEST:
MATTHEW W. THELEN, CLERK

25